

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 5, 2024

**BY EMAIL - REQUEST TO BE FILED UNDER SEAL**
Hon. Valerie E. Caproni
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

      Re:    *United States v. Antione Wright*, S2 21 Cr. 603 (VEC)

Dear Judge Caproni:

      In connection with the sentencing of Antoine Wright, the Government respectfully submits this letter, pursuant to Section 5K1.1 of the Sentencing Guidelines, to advise the Court that Wright provided substantial assistance to the Government in the prosecution and conviction of others. Accordingly, assuming Wright continues to comply with the terms of his cooperation agreement, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the United States Sentencing Guidelines and Title 18, United States Code, Section 3553(e), that the Court sentence Wright in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines and without regard to any applicable mandatory minimum.

      I.    **Relevant Conduct**

      a.  <u>Overview</u>

      Wright was part of a large, nationwide, pervasive conspiracy to defraud the NBA Players' Health and Welfare Benefit Plan (the "Plan"). Among other benefits, the Plan provides current and retired NBA players, who satisfy certain eligibility criteria, with reimbursements for qualifying medical expenses. Players are eligible to draw on a particular amount of funds, which is based on the number of seasons in which the individual played in the NBA. NBA teams fund the Plan on a regular basis. Funds available also increase and decrease based on a pro rata distribution of the Plan's investment gains or losses. In addition to players eligible to participate, certain spouses, children, and other dependents (collectively, the "Participants") may also submit claims to the Plan.

      Participants can submit claims to a third-party administrative manager. Participants can also use a debit card that is directly funded by the Plan. Where funds are dispersed and claims are approved, Participant medical expenses are paid for directly or expenses are reimbursed.

      Co-conspirator Terrence Williams was a leader in the scheme, obtaining fraudulent invoices from medical professionals, and others, and allowing others to defraud the Plan. Williams

Page 2

collected kickbacks from his co-conspirators in exchange for his work coordinating the fraud scheme. Williams worked with various doctors and medical professional to obtain these fraudulent invoices, including co-conspirators Dr. Pat Khaziran, Dr. Aamir Wahab, and Dr. William Washington. Khaziran is a California-based chiropractor; Wahab is a California-based dentist; and Washington is a Washington State-based physician who operates a wellness practice. Williams also relied on co-conspirators to create fraudulent invoices that were designed to appear as though they were created by Khaziran's chiropractic office.

Wright submitted a fraudulent reimbursement claim for $245,000 to the Plan. That claim was based on a total of approximately 19 fraudulent invoices, which Wright received from Terrence Williams. In addition, Wright submitted two letters of medical necessity ("LOMN") to bolster his fraudulent claim. The first LOMN purported to be from Dr. Khaziran, but it was not. Wright also obtained a LOMN from Dr. John Thompson. Ultimately, Wright's claim was denied, and he did not receive any fraudulent proceeds.

b. <u>Information Provided by Wright</u>

Wright participated in two full-day in-person proffers on November 1, 2021, and February 9, 2022. Wright participated in proffers remotely on April 6, 2022, and April 12, 2022. After Wright plead guilty on April 18, 2022, he met with the Government either remotely or in person on September 13, 2022, April 19, 2023, September 27, 2023, October 3, 2023, October 10, 2023, October 16, 2023, October 19, 2023, October 26, 2023, October 29, 2023, October 30, 2023, October 31, 2023, November 1, 2023, and November 2, 2023. During those meetings, Wright described the following information about the charged conduct:

In 2018, Defendant Alan Anderson approached Wright and invited him to join the scheme. Wright described Anderson as a "good friend" at that time; he was someone who Wright trusted, but their relationship was complicated. In 2011, Anderson left the NBA, and the two had a falling out because Anderson started openly using HGH at the home they shared as roommates at the time. Ultimately, Wright determined that he could remain friends with Anderson, but they could not live together because the HGH use made him uncomfortable.

Years later, Wright and Anderson worked out at the "Combine," a gym in Las Vegas, frequented by many professional basketball players. Wright also worked at the gym. At the time, some players were training at the gym in advance of the "Big3" basketball tournament. Wright complained to Anderson about the Combine's failure to pay him. Knowing he was owed money, Anderson told Wright about the NBA health insurance plan scheme. Anderson assured Wright that they would not get in trouble. Wright was skeptical, but he also knew Anderson as the type of friend who would help him.

To put Wright at ease, Anderson showed Wright invoices that he received and said they enabled him to get reimbursements. Wright understood that Anderson did not actually visit the doctors, but Wright did not ask too many questions. Anderson told Wright that Glen "Big Baby" Davis got money and that a lot of others did too. As far as the details, Anderson explained that

Page 3

Terrence Williams had a doctor who would "say that you came to his office and got procedures." Wright would be given paperwork corroborating that.

Anderson then put Wright in touch with Williams. Wright knew of Williams from the NBA, but they were not friends. Williams told Wright that he was a former team representative to the NBA Player's Association ("NBAPA") and that is how he learned about the health care plan. Williams told Wright that Davis got $300,000 and that Wright should try to get a lot too -- rebuffing Wright's suggestion that they should start with a lower amount. Later, Wright expressed his doubts about it to Anderson, but Anderson reassured him all would be fine.

When Wright saw the invoices, he knew they were fake. Wright next submitted a fraudulent claim for $245,000, and signed the reimbursement form in which he attested to receiving service he had not, in fact, received. After Wright sent the claim, Williams called Wright to check-in. Williams told Wright that some people had not paid the doctors, and that things would get "messed up" if the doctors were not paid. At some point, Williams told Wright that "Vegas was a short flight away" for Williams. Wright did not view this as a threat but rather an indication it was easy for Williams to collect the money.

Wright's claim was denied. Williams continued to pester Wright to check on the status. Anderson also pressed Wright about what to do to get the claim fixed, including sending in a letter, but at first Wright did not want to do so. Wright told Williams the same. Williams continued to contact him. Williams then emailed Wright a letter of medical necessity ("LOMN") from "Dr. Pat." Wright was skeptical about that letter because he thought it looked ridiculous. Williams reassured Wright and also told Wright, at some point, that he traced the doctor's signature on the letter. Williams told Wright not to worry about the letter and to submit it to the Plan. Wright discussed the Dr. Pat letter with Anderson. Anderson told Wright to submit the letter, and tried to reassure Wright that it would work. Wright submitted the letter, understanding that the signature on it was forged. The Dr. Pat LOMN did not cause the Plan to pay out the claim.

To remediate the claim further, Wright, Anderson, Davis and Watson, met with a doctor in Las Vegas, Dr. John Thompson, about additional LOMNs. The meeting with Dr. Thompson lasted 45 minutes. When they arrived, Dr. Thompson's office was closed, and the lights were off. Wright thought the meeting might have been a sting. While at the office, Davis told Wright he had done "this" with Williams before, which Wright understood to mean he had sent in fake invoices to the Plan. After the appointment with Dr. Thompson, Wright, Anderson, Davis, and Watson met in the parking lot. Wright mentioned the Dr. Pat letter, which Watson laughed about.

Ultimately, Wright received a letter from Dr. Thompson to substantiate the claim he had submitted, but that letter did not cause the Plan to pay out the claim either. At some point, Wright recalled Williams mentioned that he was "waiting on his girl" to get additional materials needed to get the claims approved. But, ultimately the claim was never approved, and Wright did not receive any money from the Plan.

      c. Other Conduct

Wright disclosed additional misconduct to the Government in the course of his proffers. Specifically, Wright estimated that he drove under the influence of alcohol numerous times. Wright was unsure of the precise number. Wright explained that he was not excessively drunk during those trips but recognized that he was impaired and should not have been driving. Wright was also involved in a few fights in college, with no serious injuries. For a time, Wright did not pay his child support, because he had no money; at one point, his driver's license was suspended due to his failure to pay child support. Wright possessed and used marijuana from approximately 2002, when he was in college, to 2021, just before his arrest in this case.

## II. SUBSTANTIAL ASSISTANCE AND APPLICATION OF THE 5K1.1(A) FACTORS

Wright provided information and assistance to the Government amounting to "significan[t] and useful[]" cooperation under 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1. The information Wright provided about his criminal conduct and the criminal conduct of others played an important role in the Government's ability to understand the depth and breadth of the charged conspiracy as well as the criminal activity of others.

1. "[S]ignificance and usefulness" of assistance (§ 5K1.1(a)(1)).

Wright provided a detailed historical account of his involvement in the charged conspiracy. Wright provided the Government important information about Alan Anderson's managerial role in the fraudulent scheme, including recruiting Wright to participate and facilitating obtaining fraudulent invoices and LOMNs in support of fraudulent claims. Wright's cooperation enabled the Government to charge Anderson and Williams with aggravated identity theft in Superseding Indictment S3 21 Cr. 603.

Wright also testified at the trial of Davis and Bynum. Wright's testimony provided the jury an inside account of the conspiracy, including detailing his interactions with Williams and Anderson and his use of letters of medical necessity. Wright also testified about Davis's involvement in the criminal conduct. Additionally, Wright testified to the conversations he had with Davis and to the trip that Davis and Wright made to Dr. Thompson's office. Wright's testimony was important in proving Davis's knowledge of the fraud, which was the primary disputed issue at trial. Although Wright did not provide testimony concerning the actions Bynum took—Wright's testimony was also useful in the trial against Bynum. Wright's knowledge of the scheme, and his willingness to take responsibility for his actions, helped to rebut Bynum's claim that he thought his interactions with Williams were lawful, when they clearly were not.

Although they plead guilty before trial, Wright's information would have been useful against Williams, Wahab, and Anderson, if any of them elected to proceed to trial. Wright had several conversations with Williams and Anderson about their respective roles in the scheme—and in particular, about Williams's forgery of letters of medical necessity and Anderson's aiding and abetting those forgeries. Wright also could have provided testimony about Wahab, specifically

Page 5

that Wright received fraudulent invoices generated by Wahab, even though Wright did not submit those invoices to the Plan.

2. "[T]ruthfulness, completeness, and reliability" of information and testimony (§ 5K1.1(a)(2)).

The Government believes that Wright provided truthful, complete, and reliable information. The Government assesses that Wright fully disclosed the nature of his conspiratorial relationship with others, as well as his own criminal history. Indeed, it was based predominantly on Wright's disclosures to the Government during his proffers that he was charged with, and pled guilty to, aggravated identity theft. The Government also believes that Wright testified truthfully at trial when he told the jury about what he observed and experienced regarding the charged conspiracy.

3. "[N]ature and extent" of assistance (§ 5K1.1(a)(3)).

Wright's cooperation, as described above, was considerable. Wright began cooperating soon after his arrest. Wright testified at trial, where he was subjected to extensive cross-examination. Indeed, his testimony was before two former NBA players with whom Wright was acquainted. Wright also participated in more than a dozen meetings with the Government. Wright traveled across the county to meet with the Government in-person before he plead guilty and in preparation for his trial testimony. As mentioned, Wright's information helped enable the Government to charge Anderson with aggravated identity theft, to correctly assess Anderson's guidelines, and was an important component of the Government's trial evidence against Bynum and Davis.

4. "[A]ny injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (§ 5K1.1(a)(4)).

While the Government is not aware of specific threats against Wright, his decision to cooperate was at some risk to himself. Specifically, Wright's decision to cooperate in this matter, including against other former-NBA players, may have cost him professional and social relationships. This is particularly true given that Wright testified publicly at a trial of two of his former colleagues. Also, Wright provided information about Alan Anderson who was once Wright's close friend. Though none of this rises to a level of physical injury, there was a social cost, which the Government believes is a factor the Court should weigh in imposing sentence.

5. "[T]imeliness" of assistance (§ 5K1.1(a)(5)).

As mentioned above, Wright's cooperation began soon after his arrest, was prompt, and assisted in the Government in taking certain actions soon after this case was charged.

Page 6

### III. CONCLUSION

As set forth above, the Government believes that Wright provided substantial assistance in the investigation and prosecution of others. Assuming that Wright continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move for the Court to sentence Wright without regard to any applicable mandatory minimum pursuant to Section 5K1.1 of the Guidelines and Title 18, United States Code, Section 3553(e).

Because of the sensitive nature of the information contained in this letter, the parties respectfully request that it be filed under seal.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/
Ryan B. Finkel / Daniel G. Nessim
Assistant United States Attorneys
(212) 637-6612/-2486

cc: Christopher Madiou, Esq. (By E-mail)